CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KELSEY C. DAVIDSON (CABN 322323)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6959
    Fax: (415) 436-7027
    kelsey.davidson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br>   v. <br> NINA JEAN TAFARELLA, <br>     Defendant. | Case No. 3:23-CR-00352-CRB <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Hearing Date: December 3, 2025 <br> Hearing Time: 10:00 a.m. <br> Courtroom:   6, 17th Floor <br><br> Hon. Charles R. Breyer |

## I. INTRODUCTION

Over the span of four short years, Tafarella worked for four different employers as a bookkeeper and used her position to defraud each company out of a combined total of almost half a million dollars. At each company, Tafarella relied on her past fraud to enact yet another fraud and looked for ways to steal even more money through more sophisticated means. At the first company, Becker Construction Company, Tafarella expanded her fraudulent methods and entered checks to vendors in their accounting software and then made the checks out to "cash" rather than the vendors for a total of $17,606.02. At the second company, Acacia Psychological Corporation, she stole checks and wrote them out to herself for a total of $6,496.10. At the third company, Victim Organization 1 in the Indictment (a nonprofit), Tafarella built upon her previous fraudulent schemes and entered fake bills to herself as a vendor in QuickBooks,

issued a check to herself using the fake bill as cover, and then concealed the fraud by deleting the check and bill from QuickBooks, voiding the check by replacing her name with a different vendor and changing the value to $0, changing the check numbers of legitimate payroll checks to her fraudulent checks, and then using old, uncleared checks to make the monthly reconciliation balance  She even went as far as to use white out to alter physical bank statements.  Buoyed by these successes, Tafarella engaged in her most brazen scheme at the fourth company, Victim Organization 2 (a nonprofit), where she stole $456,911.47.  At first, Tafarella engaged in the same type of fraud: she entered payments into QuickBooks as legitimate payments, then changed the payment to a different vendor, and made the checks out to herself.  But this was not enough for Tafarella, so she devised a new "ghost payroll" scheme to steal even more money.  In this scheme, she recorded payments as payroll checks first to her initials, then to fake employee names that were similar to real names (e.g. real employee names with her middle initial "J" added in), and then finally to "Internal Revenue Service EFTPS."  She altered journal entries, reported the fake payroll employees to the State of California and the IRS, and created false financial reports that the company relied upon.  In total, she defrauded the companies out of a combined $481,013.59.  Tafarella used her position as bookkeeper to take advantage of each company.  Each company suffered financial harm, and some are still working to undo the mess she made of the books.  Based on this, the United States submits that 27 months' imprisonment and 3 years of supervised release is sufficient, but not greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a).

## II.      OFFENSE CONDUCT

The United States generally agrees with the recitation of offense conduct in the Presentence Investigation Report ("PSR") prepared by the Probation Office. PSR at ¶¶ 6-19. In the span of four years, Tafarella used her position as a bookkeeper to defraud four companies where she was employed out of $481,013.49.  Specifically, Tafarella defrauded Victim Organization 1 in the Indictment out of $24,947.92, Victim Organization 2 in the Indictment out of $431,963.55, Becker Construction Company out of $17,606.02, and Acacia Psychological Corporation out of $6,496.10.

From approximately April 2021 to November 2021, Tafarella worked as a bookkeeper at Victim Organization 1, where she was responsible for processing payroll, filing quarterly and payroll income taxes, tracking funds, preparing reports for board meetings, paying the bills, making bank deposits,

manage QuickBooks, and other general accounting matters. As part of her scheme, Tafarella would enter fake bills to herself as a vendor in QuickBooks and then issue a check to "pay" the bill. These checks were made out to herself, and she deposited them in her bank account or cashed them and therefore caused wires to be transmitted from California through Kansan and Minnesota. Tafarella also had access to Victim Organization 1's checks, including pre-signed batches, and she would make out the checks to herself. Tafarella used sophisticated means to hide her fraud, including: (1) deleting the check and bill from QuickBooks; (2) voiding the check by replacing her name with the name of a different vendor and changing the value of the expense to $0 or another amount; (3) changing the check numbers of legitimate payroll checks to the fraudulent check numbers issued to herself; (4) using old, uncleared checks to make the monthly reconciliation balance; and (5) altering bank statements with white-out. After manipulating the QuickBooks accounts, Tafarella instructed Victim Organization 1 to rely only on the QuickBooks accounts rather than bank account statements, claiming that the bank statements were less accurate because the did not reflect all deposits and payments. In total, Tafarella stole $24,947.92, which she used on personal expenditures, including Amazon purchases, restaurants, and gambling. Victim Organization 1 hired a new accountant who discovered the fraud after Tafarella had left.

After Tafarella left Victim Organization 1, she began working as a bookkeeper at Victim Organization 2 from approximately February 2021 through November 2022, when she was fired. In this scheme, Tafarella built off what she had learned at Victim Organization 1 and began a similar scheme to defraud. However, she soon devised a new plan that allowed her to steal even more money. As part of her initial scheme, Tafarella began issuing fraudulent checks to herself by entering the payments into QuickBooks as legitimate payments, then changing the payment in QuickBooks to be to a different vendor. She then cashed or deposited these checks. Later, Tafarella continued her fraud by implementing a "ghost payroll" scheme. She was responsible for processing Victim Organization 2's employees' timesheets and entering their hours into QuickBooks. When Tafarella first started the ghost payroll scheme, she recorded payments as a payroll check to her initials (NJT) in the accounting system and would later change the payments to the name of one or more fake employees. Tafarella often used fake employee names that were similar to real employee names by adding the middle initial "J" to an otherwise real employee name. The fraudulent payments were then wired to her bank account. Eventually Tafarella stopped recording

payments under her initials and began recording the payments straight to the fake employee names. These fake employees in QuickBooks were all linked to her bank account. She used at least seven fake employee names, all of which are linked to her bank account. Towards the end of the scheme, Tafarella started entering fake payments under the name "Internal Revenue Service EFTPS", which was linked to her bank account and her PayPal account. Tafarella caused these wires to be sent from California to Kansas and Minnesota. In order to conceal her fraud, Tafarella employed various methods, including: (1) making fake entries into QuickBooks associated with fake vendors and fake employees; (2) using fake employee names that sounded like real employee names; (3) using the name "Internal Revenue Service EFTPS" to disguise the payments as IRS expenses; (4) altering QuickBooks records to put in fake names and social security numbers; (5) creating fake social security numbers for the fake employees, including the employee "Internal Revenue Service EFTPS," many of which were 111-22-333; (6) altering journal entries and reports; (7) reporting the fake payroll employees to the State of California and IRS; and (8) creating false financial reports that overstated the balance, which were sent to the Finance Committee and ultimately presented to the Board of Directors. She used the $431,963.55 she stole on personal expenditures, including Amazon purchases, restaurants, and gambling.

During its investigation into Tafarella, the FBI discovered evidence that she had defrauded two other corporations where she was again employed as a bookkeeper. First, in 2018, Tafarella was employed as a bookkeeper at Becker Construction Company and defrauded the company out of $17,606.02. Tafarella would enter check payments to vendors in Becker's accounting software for appropriate invoice amounts but then would make the checks payable to "cash" instead of to the vendors. Tafarella then issued duplicate checks to the vendors. The duplicate payments were then recorded in Becker's records as double payments. Second, Tafarella defrauded another prior employer, Acacia Psychological Corporation, in 2019, out of $6,496.10. Acacia noticed a discrepancy in their check book and that Acacia's check numbers skipped a large batch of numbers. They investigated further and learned that Tafarella was issuing checks to herself and another entity she had formed and forging the signature on the check. Tafarella concealed the payments in QuickBooks by entering them as rent payments.

### III.   PROCEDURAL HISTORY

On October 11, 2023, the grand jury for the Northern District of California returned a five-count

indictment against Tafarella, charging her with five counts of wire fraud in violation of 18 U.S.C. § 1343. Dkt. 1.  On December 18, 2024, Tafarella pled guilty to all counts in an open plea.  Dkt.  38.

## IV.   SENTENCING GUIDELINES CALCULATIONS

The United States agrees with the Probation Office's calculations of the Sentencing Guidelines. PSR at ¶¶ 28-38.  Specifically, the United States agrees that the defendant's total offense level is 18, and the calculations are as follows:

|  | **U.S.S.G. Section** | **Level/Points** |
| --- | --- | --- |
| Base offense level | § 2B1.1(a)(1) | 7 |
| Adjustments | § 2B1.1(b)(1)(G) – loss greater than $250,000 and less than $500,000 | +12 |
|  | § 2B1.1(b)(10)(C) – sophisticated means | +2 |
|  | § 3B1.3 – abuse of position of trust | +2 |
|  | § 3E1.1 – acceptance of responsibility | -3 |
|  | § 4C1.1(a) – zero-point offender | -2 |
| Total offense level |  | 18 |

The United States also agrees with Probation's finding that Butler has no criminal history points, placing her in Criminal History Category I.  *Id.* at ¶ 42.  An offense level of 18 with a Criminal History Category I yields an advisory sentencing range of 27 to 33 months.  *Id.* at ¶ 73.

### a.   Tafarella's Objections to the Guidelines Should Be Denied

Tafarella's argument that the enhancements for sophisticated means and abuse of trust / use of a special skill are double counting is incorrect.  First, the enhancement for sophisticated means applies. Under § 2B1.1(10)(C), the enhancement applies if the offense involved "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.  That is met here.  The commentary explains that "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, App. Note 9(b).  Here, Tafarella hid transactions through fictitious entities by creating fake employee names and manufacturing an IRS account to hide her fraudulent transactions.  She also created numerous fake documents and used white out on at least one document to hide her fraud.  *See, e.g.*, *United States v. Tanke*, 743 F.3d 1296, 1307–08 (9th Cir. 2014)

(affirming sophisticated means enhancement when defendant created false invoices and falsified carbon copies of checks to conceal payments even though defendant did not use fictitious entities, corporate shells, or offshore accounts); *United States v. Zieske*, 784 F. App'x 481, 484 (9th Cir. 2019) (affirming sophisticated means when defendant's "scheme involved creating deceptive bank-account names, . . . using several different accounts, . . . and manufacturing false documents.") (internal citations omitted); *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir.2013) (affirming sophisticated means under § 2T1.1(b)(2) when defendants syphoned money from the victim to themselves through a bank account they named "Ecologic"—a name mimicking the company's primary vendor, Eco-Logic Environmental Engineering,—in order to disguise the payments as legitimate payments); *United States v. Ada*, 700 F. App'x 689, 690 (9th Cir. 2017) (affirming enhancement when defendant "opened and used bank accounts with names deceptively similar to MMS to deposit stolen MMS checks, and he manipulated financial records to conceal his fraudulent scheme."). "Conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *Jennings*, 711 F.3d at 1145.

Second, the § 3B1.3 abuse of trust / use of special skill enhancement applies. Tafarella was in a position of trust—the bookkeeper role—when she committed her fraud, and her position facilitated both the commission and concealment of the offense. The commentary explains that individuals are in a position of trust when they have "professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" and are subject to less supervision. U.S.S.G. § 3B1.3, App. Note 1. Further, the position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.* Here, Tafarella had substantial discretion in managing the books, and she used this position in order to conceal her fraud (e.g. by doctoring the QuickBooks accounts and then presenting the false information to the company and instructing them to rely upon it). *See, e.g.*, *United States v. Hoang*, 106 F.3d 410 (9th Cir. 1997) (affirming position of trust enhancement when defendant was a bookkeeper who used her position to defraud her employer); *United States v. Wright*, 452 F. App'x 208, 211 (3d Cir. 2011) (affirming enhancement when defendant used her position as bookkeeper to create false entries and embezzle money). Further, Tafarella used her special skills as a bookkeeper to defraud the victims. *See, e.g.*, *Hicks v. United States*, No. C05-1629 JCC,

2006 WL 3373073, at *18 (W.D. Wash. Nov. 17, 2006) ("The evidence at trial supports that Petitioner used her accounting expertise to disguise the $1,981,000 actually paid to Petitioner's company to make it appear as though these sums had been paid to legitimate vendors.").

Applying both enhancements is not double counting. The Guidelines do not state that both cannot apply. Additionally, case law has upheld sentences that include both enhancements. *See, e.g.*, *Wright*, 452 F. App'x at 211 (3d Cir. 2011) (applying both enhancements); *United States v. Farrace*, 805 F. App'x 470, 475 (9th Cir. 2020) ("The district court's imposition of both the sophisticated means and abuse of trust or special skill enhancements did not constitute improper double-counting under the Sentencing Guidelines, because '[e]ach of these enhancements accounted for a different aspect of [Farrace's] offense and were separately authorized and intended by the Guidelines.'") (quoting *United States v. Stoterau*, 524 F.3d 988, 1001 (9th Cir. 2008); *United States v. Mitchell*, No. 20-4345, 2022 WL 738612, at *2 (4th Cir. Mar. 11, 2022) (finding no double counting when both enhancements for sophisticated means and abuse of trust were applied); *United States v. Quarles*, 826 F. App'x 407, 408 (5th Cir. 2020) (applying both sophisticated means and abuse of trust enhancements and noting that "§ 3B1.3 expressly permits dual application with § 3B1.1"). Thus, both enhancements should apply.

**V.  APPLICABLE LAW**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id*. After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Id.* at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)  the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(5)  the need to provide restitution to any victims of the offense.

## VI. RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a sentence of 27 months of imprisonment followed by 3 years of supervised release.

The nature and circumstances of the offense and history and characteristics of the defendant warrant a 27-month sentence. This was not a one-time fraud. Tafarella spent four years devising new ways to defraud her employers out of money and hide her fraud. The companies hired Tafarella for her expertise and she took advantage of the trust and authority she was given to steal hundreds of thousands of dollars. Her methods became more sophisticated over time, which correlated with her ability to defraud companies out of even more money.

Tafarella's fraud of Victim Organizations 1 and 2 was especially egregious when considering the fact that the organizations are nonprofits. Victim Organization 1 was a small dance school that served both children and adults, 30% of whom were on scholarships from the organization. They explained in their victim impact statement, "[This] is a place where every dollar counts, where we operate on tight margins, and where the trust we place in our employees is vital to our survival."[1] The company, already financially devastated by the 2020 pandemic, hired Tafarella believing she was there to support them and help them financially recover. They "trusted her as a colleague and friend." Instead, Tafarella stole from them, and betrayed them both personally and professionally. Victim Organization 1 explained,

> The impact of Nina's theft extends far beyond the financial loss. [Victim Organization 1] is a place where children find joy, express, and community. Many of our students rely on scholarship funds to participate in our programs. Nina's theft directly threatened our ability to continue serving our students and fulfilling our mission. We now face the difficult task of rebuilding trust with our community and regaining the funds that were wrongfully taken from us.

---

[1] The two victim impact statements from Victims Organizations 1 and 2 have been provided to the Court, Probation, and the defense.

UNITED STATES' SENTENCING MEMO         8
3:23-CR-00352-CRB

Victim Organization 2, also a nonprofit, detailed the harm they suffered due to Tafarella's actions in their victim impact statement. The CEO stated that she personally spent over 200 hours investigating the fraud and that the Board of Directors voluntarily spent countless hours ensuring that future controls were in place, which "placed an additional burden on an already strained organization." They also had to hire outside forensic accountants at a cost of over $65,000 to repair the damage done by Tafarella. In addition to these fees, the organization also incurred late fees and penalties related to Tafarella's falsification of tax returns and increased worker's compensation expenses due to Tafarella's fraudulent reporting of payroll taxes. The CEO explained, "As a nonprofit organization, these financial losses have been devastating to our operating funds and reserves. The funds we have spent on these investigations, system overhauls, and financial corrections have diverted resources from other vital programs and initiatives that [the nonprofit] supports." Moreover, not only did the organization suffer direct financial losses, but it has impaired their ability to raise future funds. The victim impact statement explained,

> [A]nother significant indirect loss has been the erosion of trust from our community members and sponsors. This breach of trust has created substantial hurdles in regaining the confidence of those who have historically supported the [nonprofit]. Many sponsors and donors have expressed hesitation in contributing financially, making it even more difficult to rebuild our reserves and continue operating at the level our community expects and deserves.

These victim impact statements detail the harm that Tafarella caused. These were not massive corporations where Tafarella's stolen funds were a drop in the bucket. Instead, Tafarella took money from nonprofits that desperately need the money in order to serve the community and further their missions. The United States recognizes that Tafarella has a mental health condition and substance abuse problems. However, she committed multiple frauds and has shown no remorse since, including by not providing a statement of responsibility to the Probation Office.

Additionally, given that Tafarella has perpetrated frauds against four companies over a span of four years, a significant sentence is needed to deter her from future frauds. A sentence of 27 months would provide adequate deterrence, and a supervised release term of three years would ensure that Tafarella has the resources to look for other jobs as well as the oversight to ensure that she is not stealing from any future employers.

A sentence of 27 months would adequately deter the defendant, reflect the seriousness of the

1 offense, promote respect for the law, and provide just punishment.

## VII. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 27 months' imprisonment, followed by a 3-year term of supervised release. The United States also requests that restitution in the amount of $481,013.59 be ordered.

DATED: November 26, 2025                         Respectfully submitted,

                                                    CRAIG H. MISSAKIAN
                                                  United States Attorney

                                                  */s/*
                                                KELSEY C. DAVIDSON
                                                Assistant United States Attorney