DAVID W. RIZK – CABN # 284376
RIZK & SHEARER LLP
466 Geary Street, Suite 201
San Francisco, CA 94102
Telephone: (415) 517-9044
Email: drizk@rs-llp.com

Counsel for Defendant TAFARELLA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

NINA TAFARELLA,

Defendant.

**Case No.:** CR 23-352 CRB

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**

**REDACTED**

**Court:** Courtroom 6, 17th Floor
**Hearing Date:** December 5, 2025
**Hearing Time:** 10:00 a.m.

## I. INTRODUCTION

Defendant Nina Tafarella is before the Court for sentencing in this theft case. Ms. Tafarella was a self-employed bookkeeper and misappropriated approximately $430,000 from the Humboldt County Fair Association, and about $49,000 from three small business. She did so primarily as a result of [REDACTED] drinking [REDACTED] [REDACTED] and a short-lived gambling addiction that she has thankfully now addressed on her own (although she would still welcome counseling). Ms. Tafarella's substantial and unsophisticated thefts from the county fair association—she paid herself using a fake payroll account and by issuing unauthorized checks—were unfortunately not discovered earlier because the organization was not professionally staffed and was in a state of utter disarray and mismanagement following the

pandemic.

Ms. Tafarella's memory of the relevant time period is fragmentary because she had been drinking too much. Her relationship with her children's father had ended and she was recovering from an addiction to prescription painkillers. She had been cheated by an employer and was trying to support herself as a bookkeeper, living between Humboldt County and Southern California. According to her friends and family, [REDACTED] Ms. Tafarella had learned to gamble from a friend who suffered from a gambling addiction, and she lost control for nearly two years compulsively gambling as a coping mechanism. At the end, she was selling her own belongings to gamble and lying to her friends about how much time she was spending at the local casino.

[REDACTED] The institution of federal charges further increased her anxiety and depression. [REDACTED] Following her hospitalization, Ms. Tafarella was accepted into a Salvation Army program, where she continues to recover from that incident and has made strides to manage her mental health and is now fully employed. Thankfully, she is also clean and sober. She quit drinking alcohol and cigarettes while on pretrial release, and she is in remission from an earlier opioid dependency.

Ms. Tafarella's best friend, a high school teacher, describes her as someone who tends to be generous to a fault. Her compulsive gambling and the thefts she committed are best understood as symptomatic of [REDACTED] not a sign of true avarice or

---

1 [REDACTED]

selfishness. Ms. Tafarella, for her part, is extremely remorseful and embarrassed by her behavior and committed to repaying her restitution. Rizk Decl. Ex. B (letter from Ms. [redacted] She is particularly saddened by the losses she caused to the fair association and the dance studio program based in Eureka. Ms. Tafarella also regrets the impact of her offense on those around her, including her two teenage children, who she fears will bear the public shame that is now attached to her name.

Ms. Tafarella has no prior criminal record of any kind, and as the Presentence Report (PSR) attests, she has lived a very difficult life. She now owes a debt that will take her years to repay. The Guideline range is 27-33 months, but the defense respectfully submits that the enhancements in the PSR for "sophisticated means" (§ 2B1.1(b)(1)(C)) and "special skill" or "private trust" (§ 3B1.3), even if technically correct, overstate the seriousness and complexity of her offense. Without those enhancements, the Guidelines would be just 15-21 months. Notably, no party is even contending that Ms. Tafarella's theft caused "substantial financial hardship" ((§ 2B1.1(b)(2)(A)) to any of the victims. Even more significantly, of course, structurally, the Guidelines also fail to account in any way for the root causes of Ms. Tafarella's behavior. The Court's sentence must represent some sanction, of course, but in the end, this was a crime borne of [redacted] addictive tendencies, and privation.

The defense therefore respectfully recommends that the Court impose a sentence of three years of probation that includes a six-month term of home confinement, so that Ms. Tafarella can continue to work and repay restitution. A more severe, custodial sentence would not advance any legitimate penal purpose (such as public safety, or deterrence), will further delay repayment to the victims, and may jeopardize Ms. Tafarella's ongoing recovery.

## II. BACKGROUND

[redacted]

[Page content redacted]

DEFENDANT'S SENTENCING MEMORANDUM
*TAFARELLA*, CR 23-352 CRB

4

[redacted]

Throughout her teenage years and twenties, Ms. Tafarella was employed in an array of retail jobs—at a toy store, hardware store, and in offices as a receptionist and medical biller. She worked extremely hard (and still does currently), up to six or seven days a week. [redacted]

Ms. Tafarella's relationship with the father of her children deteriorated, however. He was not working and [redacted] Ms. Tafarella was therefore responsible for supporting the family. At the same time, [redacted]

Ms. Tafarella separated from her former partner in approximately 2016. She continued to support her children during this period. Starting in 2010, she worked for several years at a meal delivery business, and when the owners looked to sell it, she borrowed some money from a friend and bought the kitchen equipment and business. She renamed it Delish & Nutrish, marketed it as an

---

2 [redacted]

organic and locally-grown food delivery business, and operated it for approximately 10 years with a handful of employees. It received positive reviews and brought Ms. Tafarella a degree of pride and satisfaction in work.[3] Ultimately, however, the business was not profitable enough to be sustainable and she had to close it.

Ms. Tafarella's thefts occurred at a time that she was stressed and seemingly manic at times, although she personally has a poor recollection of the period. [REDACTED] She was living between Southern California and Humboldt County to be close to her children. In Northern California, she worked at a farm briefly but was taken advantage of by her employer, who offered her a salary but then paid her at a reduced rate. She left the job and started contracting as a bookkeeper to keep herself afloat. She began drinking heavily and was still [REDACTED]

A few years earlier, Ms. Tafarella had learned to gamble from a friend who also suffered from a gambling addiction, and she started gambling as a misguided coping mechanism and it became compulsive and she lost control. She estimated to probation that she had lost up to $150,000 a year for a couple years during the offense conduct, and resorted to selling her own belongings to gamble. (In addition to wasting money at the casino, Ms. Tafarella also spent the money she misappropriated on mundane necessities, such as [REDACTED] rent and utilities, and gas for transit between Southern California and Humboldt.) Ms. Tafarella's best friend, a high school teacher,

---

[3] Michelle Drown, *Santa Barbara Independent*, "Delish & Nutrish: Organic, Locally Grown Meals Delivered to Your Door," Aug. 21, 2012, *available at* https://www.independent.com/2012/08/21/delish-nutrish/ (last accessed Nov. 28, 2025).

observed to the defense that, during this time, her mental health was suffering, and she was so erratic that she sometimes even scared her children.

Ms. Tafarella became desperate and dishonest in 2018, when she wrote several checks to "cash" while working as a parttime contracted bookkeeper at a construction business in Southern California, totaling approximately $17,000. She was confronted and, according to the business owner, complained about how much she was paid but did not deny what she had done. She was fired, and the business sought to have her prosecuted, but the local police department and District Attorney declined. Around the same time, Ms. Tafarella engaged in similar conduct while doing a small amount of work for a psychologist in private practice, writing checks to herself for approximately $6,000 over a period of a few months.

Ms. Tafarella's conduct continued when she was hired by a dance studio in Humboldt in 2021. There, over the course of a year, she wrote approximately fifteen fake checks to herself in small amounts, totaling approximately $24,000. She tried to hide the checks by altering entries in QuickBooks and with "White Out" correction fluid. The discrepancy was discovered in 2022, at the same time things were unravelling at the Humboldt County Fair Association ("HCFA").

Ms. Tafarella was hired by the fair at a time when the organization was in disarray due to mismanagement. The General Manager of the fair association had started shortly after Ms. Tafarella began. He related to the FBI that, "HCFA's management was in a state of disarray after the Covid-19 pandemic." Rizk Decl., Ex. C (US-NT-000062, FBI 302). Ms. Tafarella was hired off Craigslist because there was no financial manager or bookkeeper working for the organization. *Id.* HFCA's finances, which were "messy and complex," were left solely to Ms. Tafarella. *Id.* There was no professional accounting or bookkeeping staff at the fair. According to the Manager, "Tafarella came into HCFA at a time where were few experienced employees to provide a background to her role." *Id.* There was nobody familiar with basic bookkeeping or accounting: "Tafarella was experienced with Quickbooks accounting software and basically taught HCFA's employees how to use it." According to the General Manager, Ms. Tafarella was "the most knowledgeable" of the people working at the fair during this time period. Rizk Decl., Ex. D (US-NT-000280, FBI 302). The General Manager told the FBI that he "knew almost nothing about HCFA's payroll process" at the time. *Id.*

The fair's Treasurer painted a similar picture. He told the FBI: "HCFA's management was in chaos." Rizk Decl., Ex. E (US-NT-000222, FBI 302). For example, the fair association was required to complete year-end audits by state law, but was many years behind. *Id.* The Treasurer noted that he recalled as much because members of the community, including a local journalist, had concerns and suspicions that the organization was being mismanaged and had begun making public records requests for financial documentation. *Id.* The Treasurer candidly admitted to the FBI when interviewed that he was "not familiar with Tafarella's job duties, HCFA's payroll, or how HCFA's finances worked." *Id.* He said he looked at monthly and year-end reports in advance of Board meetings, but clarified that the Board did not "approve" those regular financial reports because they did not review the underlying data, and instead explained that the Board simply "accepted" them. *Id.*

A part time employee who was serving as an interim manager and hired Ms. Tafarella in that role, confirmed to the FBI that the fair association was in utter disrepair when she arrived. As of 2020, there had not been any manager for almost a year. Rizk Decl., Ex. G (US-NT-005798, FBI 302). The office was almost completed unattended, she explained to the FBI: "HCFA did not have a bookkeeper, assistant, secretary, or anyone else. HCFA had approximately a year worth of backlogged mail and files on the floor." *Id.* Nobody was reviewing the fair's bank accounts. *Id.* The fair association had changed accountants "multiple times over the years," and, "[a]s a result, it was hard to review HCFA's past financial history because all of the accounts were jumbled about." *Id.* In addition, "HCFA's Board members were not financially savvy." *Id.* The part time employee realized that Tafarella at least "seemed to understand Quickbooks and the concepts at hand." *Id.* Ms. Tafarella was paid approximately $35-40 per hour, which was relatively little, she explained—"especially compared to what a CPA firm cost." *Id.* The fair's financial problems were also pressing because of the backlogged state audits: "The fair was a mess and needed State funding." *Id.* "At the time, HCFA was approximately 15 years behind in its audits, so the State was threatening to withhold funding." *Id.*

This was the state of the fair association's affairs when Ms. Tafarella was hired. She brought a considerable degree of disorganization and manic energy with her, although she was liked and polite to everyone. She was not reliable to show up for work during business hours, and was frequently

observed at the casino. Nevertheless, as those at the fair noted to the FBI, she appeared to understand bookkeeping better than anyone else, appeared to work really hard, and had some modest successes in improving the fair's bookkeeping and office organization. She was also, of course, being dishonest by skimming money from the fair's books. Asked about that time, Ms. Tafarella has consistently related to her friends and family, probation, the neuropsychologist, and counsel, that she does not remember it well. This is not an evasion: she was drinking heavily, depressed, and [REDACTED] She had very little idea of exactly how much money she had stolen from the fair association and lost gambling, and was genuinely shocked to review the figures during the pendency of this case (hence the delay in sentencing, while she reviewed in detail all the checks and entries).

It was not until late 2022 that the fair association hired an accountant to try to clean up its books. The accountant told the FBI that she quickly realized that the fair's balance sheet was not balanced and that Ms. Tafarella clearly "did not know what she was doing." The Board tried to keep the matter quiet and out of the press, while reporting it to local law enforcement. Ms. Tafarella was contacted by a fair association Board Member at the Bear River Casino in Humboldt and was told that she had a warrant for her arrest. She agreed to turn herself in after settling out at the casino. Before she could do so, law enforcement arrived to arrest her.

Ms. Tafarella was extremely remorseful about her thefts from the beginning. After her arrest but before this case was instituted, she moved out of Humboldt and in with her father in Southern California. She spiraled into a [REDACTED] At the same time, she was able to put an end to her gambling on her own. She reported as follows to the neuropsychologist who evaluated her: "Ms. Tafarella reported she has not gambled since her arrest and does not want to do so again. She said the shame she feels over stealing to fund her gambling is a strong deterrent. She stated, 'It makes me sick. I feel disgusted in myself when I think about it (stealing and gambling).' She said the biggest motivating factor not to gamble is the guilt she feels

about her behavior and not wanting to further disappoint her children." *Id.* at 7.

Ms. Tafarella was indicted approximately a year later in October 2023. ECF No. 1. She was referred to mental health treatment, but the Central District of California had difficulty identifying a provider that could serve her in the Santa Barbara area. Although she was originally living with her father at that time, disputes between them increased her anxiety and stress, and she began living in her car while searching for regular work. She quit drinking and cigarettes entirely.

Since that time, she has been working fulltime as a receptionist in a medical office, and pays rent to live at a low-income housing program run by the Salvation Army. She spends as much time as possible with her son and speaks to her daughter regularly. She has built strong and supportive relationships with her psychiatrist and therapist. In the future, she hopes to be able to obtain housing such that she can live with her children. Soon, she will able to afford to rent a room in an apartment complex, but she has held off doing so because she is fearful of the Court's sentencing decision.

## III. PRESENTENCE REPORT & GUIDELINES

The defense's substantive objections to the Presentence Report (PSR) have been resolved. The defense instead urges the Court to consider the objections to the Guidelines enhancements for "sophisticated means" (§ 2B1.1(b)(1)(C)) and "special skill" or "private trust" (§ 3B1.3), as grounds for downward variance. In addition, as set forth below, the defense respectfully urges the Court to vary downward because the Guidelines fail structurally to account for the predominant factual circumstances that explain Ms. Tafarella's crime—namely, coupled with her use of alcohol and other substances to regulate her symptoms, and a gambling addiction that was out of control but is now in remission.

## IV.   ARGUMENT

Courts have an overarching obligation to impose sentences that are sufficient but not greater than necessary to achieve the goals of § 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Although they provide a starting point and should be respectfully considered, the Guidelines are not mandatory and should not be accorded more weight than the other section 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Importantly, not only are the guidelines not mandatory, "they are also not to be presumed reasonable." *Nelson v. Arizona*, 555 U.S. 350, 352 (2009) (emphasis added); *see also Rita v. United States*, 551 U.S. 338, 350-51 (2007). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Several matters warrant the Court's consideration in connection with the § 3553(a) factors and Ms. Tafarella's request for a sentence of three years of probation with a six-month term of home confinement:

### A.   The Circumstances of the Offense and Ms. Tafarella's Personal History.

As to the circumstances of the offense and Ms. Tafarella's personal history, a custodial sentence is unnecessary. As to the offense, the harm created is primarily financial although the defense appreciates that the losses also have consequences for the operation of the dance studio and the fair association and hence the community in Humboldt County. That is, certainly, the worst fact in this case—and it causes Ms. Tafarella serious shame and embarrassment. Her major hope at this point in life is to repay the victims in this case, although that will be a difficult and long-term

undertaking. Almost every other fact in the case about the circumstances, the defense respectfully submits, militate in favor of a non-custodial sentence.

*First*, as set forth above, this was a crime that was motivated by: [REDACTED] [REDACTED], medication, and substances that Ms. Tafarella was using unsuccessfully as a coping mechanism; depression and isolation that was fueled by [REDACTED] [REDACTED] and a gambling addiction that fed into her mental health problems and was a serious affliction onto itself. The reality is that although we need and want and hope individuals who are suffering from these kinds of environmentally- and genetically-caused maladies to take steps to take care of themselves and those around them, we cannot fully fault somebody who comes from a [REDACTED] [REDACTED] that give way to substance use disorders and gambling addiction. The best we can do is help them recover and avoid a relapse. Thankfully, Ms. Tafarella has now taken steps—starting even before the case was instituted—to redress these conditions in order to ensure she never reoffends. She deserves considerable credit and recognition for taking these steps.

By the same token, it is important to recognize that Ms. Tafarella's offense was not motivated by sheer avarice or cold and calculated selfishness, like many thefts and other so-called "white collar" offenses. Remarkably, Ms. Tafarella's friends recognize as much—just like some of the victims have also acknowledged. The fair association's CEO, who was hired after Ms. Tafarella and has written the fair's formal Victim Impact Statement to the Court, candidly explained to the FBI that Ms. Tafarella was actually very "friendly and kind." According to the FBI: "Kenny thought what happened was heart breaking because Tafarella was a kind and generous person. For instance, Tafarella brought Kenny hand-me-down clothes to give to Kenny's daughter from Tafarella's daughter. … Tafarella also occasionally brought in coffee for everyone in the office."

The General Manger of the fair said the same thing to the FBI: "Silacci believed Tafarella was part of HCFA's team and was dedicated to making the fair successful. Tafarella was a little unreliable on days that she was supposed to pay bills, but HCFA's bills were always paid on time. Tafarella was organized when it came to vendor payments and Silacci never received any calls from vendors about payment issues. Tafarella was kind of scattered and hard to get focused on a task, as if she had

Attention Deficit Disorder. Silacci was not sure if that was her real personality or part of the game she was playing. To Silacci's knowledge, there were no conflicts between Tafarella and other HCFA employees. That was part of the reason Silacci found the situation with Tafarella so dishearenting." Rizk Decl., Ex. C, at 5.

Ms. Tafarella's best friend told defense investigators the same thing—that she is overly generous, to a fault. She has babysat coworkers' children for free, stopped on the road to give water to a motorist in distress, thrown parties to celebrate others even though she was broke, and could not afford to do so, etc. In sum, this is not an offense that was motivated by money, at bottom. Instead, the offense was a dysregulated response to a mental health condition that was undiscovered, fueled by related substance use, and a gambling addiction that ran briefly—but seriously—out of control.

*Second,* for a federal case, the loss amounts are quite low, except for the county fair association's loss, of course. Indeed, local authorities actually declined to pursue the small loss amounts suffered by the small businesses (nevertheless, Ms. Tafarella has raised no objection to paying as restitution those losses here). Perhaps most tellingly, neither the government nor U.S. Probation seeks any enhancement for causing "substantial financial hardship" for even one of the victims. *See* U.S.S.G. § 2B1.1(b)(2)(A) ("if the offense … resulted in substantial financial hardship to one or more victims, increase by two levels"). Ms. Tafarella is grateful that she did not cause any "substantial financial hardship," even if she wasted significant funds and employee time clearing up her thefts.

Obviously, this was also not an offense like many that the Court sees where there was physical or emotional harm or some other kind of especially insidious injury to the victims. Given that there was only a limited amount of financial harm, the defense respectfully submits that this is simply not a case that warrants a multiyear or even multi-month custodial sentence in federal prison. Ms. Tafarella should be permitted to continue to work to repay her debt. Considering the cost of incarceration and also the impairment to Ms. Tafarella's long-term earning potential and ability to repay her victims, any sentence like the ones advocated by the government or U.S. Probation would be very counterproductive and disproportionate to the cost of the underlying offense itself.

*Third*, as to the most sizeable theft by far, and recognizing Ms. Tafarella's overwhelming

personal responsibility, in terms of the circumstances of the offense, it must also be acknowledged that the scope of the county fair's loss was partially the product of severe mismanagement. The disrepair preceded her by many years. There was virtually no staff when she was hired as a contractor, and its finances and operations were in serious disarray—and that is according to those responsible for the organization's well-being. There were papers strewn around its offices, it was many years behind on legally-required state audits such that the state was threatening to withhold funding, and nobody was able to trace its financial operations through the mess of its books. Board members of non-profits are fiduciaries that are charged with monitoring and managing the well-being of their community-oriented organizations. Remarkably, the fair association's own witnesses admitted that the Board was not financially savvy and had little to no idea about the state of the fair's finances. Instead, they solely entrusted Ms. Tafarella, who was suffering from [redacted] visibly anxious, drinking too much, acting erratically, and reliably to be found at the casino, with the fair association's finances. Notably, the small businesses involved in this case, which appear to have been much more responsibly operated, discovered Ms. Tafarella's bad checks when their losses were in the very low thousands, not six figures.

*Fourth*, Ms. Tafarella's personal circumstances do favor leniency and are not accounted for by the Guidelines in any way, of course. There can be no serious dispute that Ms. Tafarella suffered an extremely traumatic early life, as the PSR and the neuropsychological evaluation attest in extensive detail. She was exposed to [redacted]

[redacted] and thus quite vulnerable to the compulsive gambling addiction that facilitated her offense. Now, she has stopped gambling, been completely sober for over a year, and [redacted] She is employed six days a week, has found stable housing, and continues to work on herself with her psychiatrist and therapist.

In sum, the circumstances of the offense and Ms. Tafarella's personal background strongly counsel in favor of a non-custodial sentence.

**B. Just Punishment, Deterrence, and Public Safety.**

Just punishment, deterrence, and public safety considerations, do not require a custodial sentence in this case. The defense appreciates that the Court must impose a sentence that weighs the victims' financial interests as well as the need to dissuade others from committing the crime of embezzlement, among other factors.

Regarding just punishment, the defense respectfully submits that a custodial sentence is not appropriate here. This is not a case involving greed, sophistication, callousness, severe harm, or other aggravating factors that might merit imposing a federal custodial sentence; for all the reasons already set forth above, this is a very different story. There is no allegation of "substantial financial harm" to even a single victim. There are no individual victims; the only organizational victim to suffer a significant loss was unfortunately mismanaged for many years before Ms. Tafarella was even hired and now complains of the "reputational" harm that her theft has created. In sum, this is not a case that merits severely punishing Ms. Tafarella, especially given the difficulties she has already suffered throughout her life, and as a direct result of this case. While the defense certainly recognizes the harm created by Ms. Tafarella in the case, it is in fact financial, and it can be largely mitigated and remedied in these circumstances by complete repayment to the victims. That ought to be the Court's primary objective in a case such as this. Symbolic punishments and public sanctions in the form of federal imprisonment are not appropriate.

As to public safety, there is no realistic likelihood that Ms. Tafarella will reoffend. The interventions that this case represents, and that Ms. Tafarella has staged for her own well-being, are highly likely to be effective. It bears repeating, Ms. Tafarella has no prior criminal history in her entire life. She has never been arrested. She has never been charged. She qualifies for the Guidelines' "Zero Point Offender" adjustment. This case was not the result of a sophisticated or complicated scheme. There were no co-defendants, no organized effort, no weapons, no threats, no harm other than financial stress. Ms. Tafarella, when it really comes down to it, presents no threat to public safety whatsoever. She is remorseful, embarrassed, and ashamed.

As for deterrence, in Ms. Tafarella's case, there is no credible case that putting somebody like her in federal prison or in jail will deter herself or others who are similarly situated. Those who suffer from [redacted] substance use disorders, or even gambling addiction as a result of the foregoing, are not likely to be amenable to deterrence due to sentences handed down by the Court. Ms. Tafarella is not a "white collar" defendant who rationally elected to commit a financial crime out of greed and the belief that she would never be caught. She had no rational thought-process. As she explained to undersigned counsel, she realized that her scheme was likely to be discovered and yet she still engaged in the same self-sabotaging behavior as a result of her mental health and other factors. Finally, to the extent that a longer custodial sentence might seem to the Court to promise some academic and greater deterrent effect, some of the most recent evidence from the Sentencing Commission reveals that there is no deterrent effect from federal sentences imposed that are less than 60 months; a longer or shorter sentence under that threshold has no statistical impact on the likelihood of recidivism.[4] Accordingly, there is no empirical basis to believe that a longer sentence of, say, 18 months as U.S. Probation recommends, or even 27 months as the government requests, would achieve greater deterrent effect than the six month sentence of home confinement that the defense proposes.

---

[4] U.S. Sentencing Commission, *Length of Incarceration and Recidivism*, June 2022 at 4 ("For federal offenders sentenced to 60 months or less incarceration, the Commission did not find any statistically significant differences in recidivism."), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed Nov. 5, 2025).

**C. Educational, Vocational, Medical, and other Correctional Treatment.**

As to educational, vocational, medical, or other correctional treatment, no custodial sentence is going to provide Ms. Tafarella any practical benefit. Notably, neither U.S. Probation nor U.S. Pretrial Services has determined that Ms. Tafarella needs residential treatment for her sobriety or significant treatment to ensure her abstinence from gambling. She is also presently working and does not need any vocational assistance. Mental health counseling will not be provided in any meaningful way by the Bureau of Prisons, and it has no gambling-related programming that could be helpful. The prison system offers nothing to Ms. Tafarella. A prison sentence would be purely punitive, and counterproductive to her personal growth. Of course, it would also preclude her from being employed and thus delay compensation to the victims considerably. In sum, a probationary sentence with a sentence of home confinement will suffice to meet Ms. Tafarella's needs and advance the victim's financial interests.

**D. The Need to Avoid Unwarranted Disparities.**

Finally, the Court is charged with honoring the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The defense offers two observations for the Court's consideration.

*First,* the government's recommendation is well out of line with other cases sentenced over the years by the Court:

- *United States v. Howatt,* Case No. 15-CR-101 CRB: the loss amount was $3.9 million; he spent the money to purchase real estate, artwork, motorcycles, and a boat; he was able to repay the majority of the loss amount because he and his family had substantial assets; the Court sentenced him to twelve months and a day.
- *United States v. Reyes,* Case No. 06-CR-0556 CRB: the total value of the fraud estimated by the government's expert was over $900 million; the defendant was highly sophisticated and not influenced by any addiction; the Court sentenced him to 18 months of custody.
- *United States v. Bhikha*, No. 19-CR-0115 CRB: the defendant was ordered to pay $1.15 restitution to his employer Cisco Systems and $2.5 million of tax debts to the IRS, in a

sophisticated kickback scheme that the government contended resulted in far greater loss amounts; the defendant attended college and enjoyed significant wealth; the Court granted the defense's request and sentenced the defendant to 36 months of custody.

All of these cases are considerably more aggravated and involved far more sophisticated defendants who committed frauds or thefts of far greater value. None of them come close to supporting the sentencing recommendations from U.S. Probation or the government.[5]

*Second*, as it relates to unwarranted disparities, the defense also submits that the enhancements in the Guidelines for "sophisticated means" (§ 2B1.1(b)(1)(C)) and "special skill" or "private trust" (§ 3B1.3), while technically applicable, significantly overstate the sophistication or complexity of the theft in this particular case. As the government points out: "Conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013). Ms. Tafarella is not a lawyer or an accountant, a broker or other professional. She has not even graduated from college and has no advanced certificate to even act as a bookkeeper. Rather, she is entirely self-taught, and her offense largely constituted issuing bad checks. The "sophistication" that she supposedly deployed in creating a payroll account and altering QuickBooks entries and balance statements was in fact almost immediately ferreted out by an actual accountant who quickly concluded that Ms. Tafarella "did not know what she was doing." Similarly, Ms. Tafarella abused her position as a bookkeeper, and she does not deny it; but she did so at a public-trust organization that was so severely mismanaged and underfunded that she was the only person who knew anything about bookkeeping.

As is relevant to the objection here, tellingly, the government is demonstrably inconsistent in seeking to apply these enhancements. Rather, the application of it appears to depend on the government counsel that is assigned to the case. For example, in *United States v. Markus*, 22-CR-57 CRB, on virtually identical facts that were before this Court—another middle-aged single mother who became addicted to pills and gambling and embezzled $1.7 million as the bookkeeper to a car dealership—the government offered the defendant a plea deal that forewent enhancements for

---

[5] *United States v. Markus*, 22-CR-057 CRB is also relevant but the defendant in that matter was undersigned counsel's client and therefore no additional comment is offered.

"sophisticated means" and "special skill." When defense counsel asked government counsel in this case for a plea agreement with similar terms for Ms. Tafarella, the government simply refused, without explaining substantively and on the merits why the enhancements should not apply in *Markus* but should apply in this case. *See also United States v. Markus*, 22-CR-57 CRB, United States' Sentencing Memorandum, at 1-2 (explaining that as to her employers, Ms. Markus "exploited their trust" by "fraudulently creating special payrolls for herself" and "also fraudulently wrote checks to herself" and then "covered her tracks" by "manipulating the bank reconciliations and ledgers"), and 3-4 (calculating the Guidelines without reference "sophisticated means" or "special skill" enhancements). There is no principled reason, of course. Thus, while the enhancements may technically apply under the Guidelines, the government has not sought to have them applied in other cases, seemingly for no reason whatsoever that government counsel is able to articulate. The government's inconsistent positions in plea negotiations in such cases creates unwarranted disparities that the sentencing statute forbids. The government has no answer whatsoever, but the impact for defendants is quite real. The defense urges the Court to sentence Ms. Tafarella to a sentence that permits her to prioritize repayment of the victims and put aside the government's manipulations of the advisory Guidelines. Without the enhancements that the government inconsistently invokes, again, the range is just 15-21 months. For the reasons set forth above, a non-custodial sentence is due, especially given when compared to other cases.

## V.     CONCLUSION

For all the reasons set forth above, Ms. Tafarella respectfully asks the Court to sentence her to three years of probation with a term of six months of home confinement.

Dated: November 28, 2025

Respectfully submitted,

DAVID W. RIZK
RIZK & SHEARER LLP
Counsel to Ms. Tafarella